**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**UNITED STATES OF AMERICA,**

    **v.**                                                          **Criminal Case No. 3:19cr153**

**SOLOMON MATTHEW HUNT,**

    **Defendant.**

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant Solomon Matthew Hunt's Motion

to Reduce Sentence Pursuant to Section 603(b) of the First Step Act and 18 U.S.C.

§§ 3582(c)(1)(A) & (c)(2) (the "Motion for Compassionate Release"). (ECF No. 47.) The

United States responded in opposition and Hunt replied. (ECF Nos. 53, 54.)

This matter is ripe for disposition. The Court dispenses with oral argument because the

materials before it adequately present the facts and legal contentions, and argument would not

aid the decisional process. For the reasons that follow, the Court will deny the Motion for

Compassionate Release.

**I.  Background**

**A.      Mr. Hunt's Underlying Offense**

On September 26, 2019, Hunt was charged by criminal complaint with bank fraud in

violation of 18 U.S.C. § 1344 and aggravated identity theft in violation of 18 U.S.C.

§ 1028A(a)(1). (ECF No. 1, at 1.) On October 16, 2019, Hunt was charged in a six-count

indictment: three counts of bank fraud in violation of 18 U.S.C. § 1344 and three counts of

aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1). (ECF No. 9, at 1.) On

December 12, 2019, Hunt entered into a written plea agreement with the United States in which

he pleaded guilty to one count of "Bank Fraud, in violation of Title 18, United States Code, Section 1344" (Ct. 3) and one count of "Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A" (Ct. 6). (ECF No. 15, at 1.)

Prior to Mr. Hunt's March 16, 2020 sentencing, the probation officer prepared the Presentence Report ("PSR") for Hunt, summarizing the conduct of Hunt's underlying offense. (ECF No. 27.) Mr. Hunt engaged with others in a bank fraud scheme that culminated with Mr. Hunt being apprehended by Richmond International Airport ("RIC") police on April 10, 2019. (*See* ECF No. 27 ¶ 14.) In the period leading up to his arrest, Mr. Hunt obtained counterfeit credit cards and licenses to use in fraudulent transactions. (ECF No. 27 ¶ 14.) These transactions included attempting to obtain and obtaining a rental car in another's name without any intent to return it. (ECF No. 27 ¶ 14.) The total intended loss attributable to Mr. Hunt was more than $95,000 but less than $150,000. (ECF No. 27 ¶ 34.)

The PSR also summarizes his offense level and criminal history. (ECF No. 27 ¶¶ 32–84.) Mr. Hunt received an eight-point enhancement to his offense level for the intended loss amount under U.S.S.G. § 2B1.1(b)(1)(E). (ECF No. 27 ¶ 34.) Mr. Hunt also correctly received a two-point enhancement for being involved in an organized scheme to steal or to receive stolen vehicles or vehicle parts under § 2B1.1(b)(15)(A). (ECF No. 27 ¶ 35.) Hunt received a three-point reduction for his acceptance of responsibility under U.S.S.G. § 3E1.1(a)–(b), resulting in a Total Offense Level of 14. (ECF No. 27 ¶¶ 41–42.)

**B.     Mr. Hunt's Criminal History Computation**

Mr. Hunt's criminal history score subtotaled 11 points. (ECF No. 27 ¶ 70.) However, Mr. Hunt received a two-point addition to his criminal history score computation pursuant to U.S.S.G. § 4A1.1(d) (2021) because he committed the underlying offense "while under a

criminal justice sentence for Driving While Intoxicated, 2nd Offense Within 5 Years and Possess Marijuana, 2nd Offense.[1]  (ECF No. 27 ¶ 71.)  This led to a criminal history score of 13 and a Criminal History Category of VI.

Under the November 1, 2023 Sentencing Guideline Amendments, however, the provisions of U.S.S.G. §4A1.1(d) (2021) transitioned to U.S.S.G. §4A1.1(e) (2023).  Under Amendment 821 at §4A1.1(e), Mr. Hunt would receive only one additional criminal history point for committing the offense while under any criminal justice sentence.  This provision of Amendment 821 applies retroactively.  U.S.S.G. §1B1.10(d) (2023).

With this adjustment, Mr. Hunt's criminal history score would be 12 and his Criminal History Category would be V, not VI.  With a Total Offense Level of 14 and a Criminal History Category of VI, the recommended sentencing range on Count 3 was 37–46 months' imprisonment.[2]  However, with a Criminal History Category of V, the recommended Guideline Range would be 33–41 months.

The Court granted Mr. Hunt's Motion for Variance Sentence, (ECF No. 23), and sentenced Mr. Hunt to 33 months' incarceration on Count 3, and the mandatory 24 months' incarceration on Count 6 (running consecutively), to be followed by four years of supervised release on Count 3 and one year on Count 6, all to run concurrently.  (ECF Nos. 35, at 3; 36, at

---

[1] His prior convictions include multiple offenses of driving while intoxicated and driving while on a suspended license, possession of a firearm by a convicted felon, identity theft to avoid arrest, conspiracy to sell and distribute marijuana, forgery of public records, and contempt.  (ECF No. 27 ¶¶ 47–69.)

[2] Mr. Hunt was also convicted of Count 6, Aggravated Identity Theft, in violation of 18 U.S.C. 1028(A).  That count requires a mandatory consecutive 24-month sentence regardless of the sentence for Count 3.  It remains unaffected by any other statutory or sentencing guideline changes.

2–3.) This sentence falls in the lowest end of the Criminal History Category V guidelines range. Having conducted a thorough analysis under 18 U.S.C. 3553(a) at the time of sentencing, this judge finds that the change to 4A1.1(d), even applied retroactively[3] and on separate review, requires no additional reduction based on Amendment 821 and §4A1.1(e).

The PSR also provided information on Mr. Hunt's physical and mental condition. (ECF No. 27 ¶¶ 98–102.) Mr. Hunt reported that he was "in good physical health, that he [did] not suffer from any allergies", and that he was not then taking prescribed any medications. (ECF No. 27 ¶ 99.) On July 11, 2015, Mr. Hunt was treated at the Virginia Commonwealth University Medical Center for a stab wound to his lower chest. (ECF No. 27 ¶¶ 99–100.) Mr. Hunt also reported that he had rods inserted into his ankle in or about 2016 or 2017 to treat a broken ankle "sustained during a motorcycle accident." (ECF No. 27 ¶ 99.)

Mr. Hunt is currently housed at FCI Hazelton in Bruceton Mills, West Virginia. *See Fed. Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 7, 2024). The Bureau of Prisons ("BOP") lists Hunt's release date as March 28, 2025. *See id.*

**C.     Mr. Hunt's Motion for Compassionate Release Based on COVID-19 and Lack of Safety in BOP Custody**

**1.     Mr. Hunt's Health Conditions**

On March 3, 2023, Mr. Hunt, through Counsel, filed the instant Motion for Compassionate Release. (ECF No. 47.)   In the Motion, Mr. Hunt describes how his health conditions make him particularly susceptible to complications from COVID-19. (ECF No. 47, at 5–10.) Hunt, now thirty-five years old, contends that his hypertension and alleged obesity "place

---

[3] On January 5, 2024, the United States Probation Office conducted a review of Mr. Hunt's sentence.  Because Mr. Hunt was sentenced at the low end of the amended guidelines range, Mr. Hunt is ineligible for an additional sentence adjustment under Amendment 821. (ECF No. 56, at 1.)

4

him at a higher risk of severe illness from COVID-19 according to the [Centers for Disease

Control and Prevention ('[CDC[')]."  (ECF No. 47, at 6–8.)  Mr. Hunt asserts that his "most

recent documented blood pressure was 145/87 on January 13, 2023", which places him in the

category of Stage 2 hypertension.  (ECF No. 47, at 7.)  Mr. Hunt is seventy-two inches (or six

feet) tall and reported his weight as of September 12, 2022, as being 185 pounds.  (ECF No. 47,

at 7.)  "According to the CDC Adult BMI Calculator, this places Mr. Hunt at a BMI of 25.1."[4]

(ECF No. 47, at 7.)

    This means that, under CDC standards, Mr. Hunt is not obese.  *See About Adult BMI*,

CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited Feb. 7,

2024).  Indeed, he is more than four percentage points below a BMI figure that would categorize

him as obese, and just 0.1 percent over what would place him in the "Overweight" category

rather than the "Healthy Weight" category.

The standard weight status categories associated with BMI ranges for adults are
shown in the following table.

| BMI | Weight Status |
|---|---|
| Below 18.5 | Underweight |
| 18.5 – 24.9 | Healthy Weight |
| 25.0 – 29.9 | Overweight |
| 30.0 and Above | Obesity |

*See id.*[5]

---

[4] Federal Rule of Evidence 201(b)(2) provides that "the court may judicially notice a fact
that is not subject to reasonable dispute because it . . . can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).
Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the CDC's BMI
categories.  *See About Adult BMI*, CENTERS FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/healthyweight/assessing/ bmi/adult_bmi/index.html (last visited Feb. 7,
2024).

[5] "For adults 20 years old and older, BMI is interpreted using standard weight status
categories.  These categories are the same for men and women of all body types and ages."  *Id.*

Mr. Hunt also describes his COVID-19 vaccination status as "not fully vaccinated" as he has received three doses of the monovalent vaccine, but "has not received an updated, bivalent version of the vaccine." (ECF No. 47, at 8.)

In addition to hypertension and being overweight, Mr. Hunt suffers from gastroesophageal reflux disease ("GERD"). (ECF No. 47, at 8.) Mr. Hunt admits that GERD "may not on its own increase [his] risk of severe complications from COVID-19", but alleges that "it did, indirectly, lead to his assault" which is described in detail below. (ECF No. 47, at 8.)

### 2. **Mr. Hunt's Concern for His Safety**

Mr. Hunt avers that he was assaulted by BOP staff members at FCI Petersburg when he sought treatment for GERD on June 25, 2022. (ECF No. 47, at 4, 8.) Mr. Hunt alleges that "a guard tried to prevent [him] from accessing medical care" after he "left his cell to go to the medical unit", and that Hunt then "insisted on going to the medical unit". (ECF No. 47, at 4.) In response, Mr. Hunt attests that "multiple prison staff members assaulted him", and that Hunt "suffered neck and back injuries" as a result. (ECF No. 47, at 4.) After the incident, "Mr. Hunt was placed in the segregated housing unit ([']SHU['])" to protect him from retaliation from staff at Petersburg. (ECF No. 47, at 4.) On September 1, 2022, BOP transferred Mr. Hunt to FCI Butner II, where he was again housed in the SHU. (ECF No. 47, at 5.) At the time of filing, an ongoing investigation into the incident was occurring, and Mr. Hunt was cooperating with investigators from the Office of the Inspector General. (ECF No. 47, at 5.)

On April 14, 2023, the United States filed a Response in Opposition. (ECF No. 53.) The United States opposes Hunt's requested sentence reduction, arguing that Hunt's medical conditions do not make him particularly susceptible to COVID-19 and that he has not shown a particularized risk of contracting COVID-19 at FCI Butner II. (ECF No. 53, at 4.) The United

States further argues that Hunt has not demonstrated that he continues to be at risk of assault at FCI Butner II. (ECF No. 53, at 4, 10.) Finally, the United States contends that the sentencing factors set forth in 18 U.S.C. 3553(a)[6] weigh against Mr. Hunt's immediate release. (ECF No. 53, at 11–12.)

---

[6] Section 3553(a) of Title 18 of the United States Code states, in pertinent part:

The court, in determining the particular sentence to be imposed, shall consider—

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for—

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

    (5) any pertinent policy statement—

        (A) issued by the Sentencing Commission . . .

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

As identified below, Mr. Hunt was transferred to FCI Hazelton since briefing occurred in this case. *See Fed. Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 7, 2024). The Court will consider that fact as part of its analysis.

### 3.     Material Changes in Circumstances Since Mr. Hunt's Motion was Filed

The global circumstances surrounding Mr. Hunt's claims have changed materially in the time since he filed his Motion. First, based on COVID-19 trends, on April 10, 2023, the President signed into law a Joint Resolution terminating the COVID-19 National Emergency.[7] Second, the United States Department of Health and Human Services allowed the federal Public Health Emergency for COVID-19 to expire on May 11, 2023.[8] In sum, given the decrease in COVID-19 exposure numbers, the emergency protections deemed necessary during the pandemic have been lifted.

Additionally, Mr. Hunt was transferred to FCI Hazelton since the filing of the briefing in this case. *See Fed. Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 7, 2024).

Neither party has supplemented the record to indicate any different or additional circumstances that this Court should consider.

---

[7] *See* Pub. L. No. 118–3, 118th Cong. (2023), https://www.congress.gov/118/plaws/publ3/PLAW-118publ3.pdf (last visited Feb. 7, 2024).

[8] *See COVID-19 Public Health Emergency*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html#:~:text=Based%20on%20current%20COVID%2D19,day%20on%20May%2011%2C%202023 (last visited Feb. 7, 2024).

## II.  Compassionate Release Under the First Step Act of 2018

### A.      Legal Standard

Prior to the First Step Act of 2018, an individual could not petition the district court for

relief on compassionate release grounds without approval from the BOP.  *See Coleman v. United*

*States*, 465 F. Supp. 3d 543, 546 (E.D. Va. 2020).  In 2018, Congress enacted the First Step Act

to provide incarcerated individuals the opportunity to directly petition the courts for

compassionate release under 18 U.S.C. § 3582(c)(1)(A).[9]  First Step Act of 2018, Pub. L. No.

115–391, 115th Cong. (2018).  Under the First Step Act, criminal defendants may petition courts

on their own initiative to modify their sentences.  *Coleman*, 465 F. Supp. 3d at 546.

---

[9] Section 3582(c) states, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed
except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of
Prisons, or upon motion of the defendant after the defendant has
fully exhausted all administrative rights to appeal a failure of the
Bureau of Prisons to bring a motion on defendant's behalf or the
lapse of 30 days from the receipt of such a request by the warden
of the defendant's facility, whichever is earlier, may reduce the
term of imprisonment (and may impose a term of probation or
supervised release with or without conditions that does not exceed
the unserved portion of the original term of imprisonment), after
considering the factors set forth in section 3553(a) to the extent
that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a
reduction . . .

and that such a reduction is consistent with
applicable policy statements issued by the
Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Before granting a reduction, courts must consider the factors set forth in 18 U.S.C. § 3553(a), *see* 18 U.S.C. § 3582(c)(1)(A), and evidence of rehabilitation and other post-conviction conduct. *See United States v. Martin*, 916 F.3d 389, 397–98 (4th Cir. 2019) (requiring consideration of post-conviction evidence and statutory sentencing factors in the context of a sentence reduction sought pursuant to § 3582(c)(2)); *see also United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021) (extending *Martin* to motions filed pursuant to § 3582(c)(1)(B)). However, a petitioner's rehabilitation alone does not provide sufficient grounds to warrant a sentence modification. *See* 28 U.S.C. § 994(t).[10]

**B.     Exhaustion of Administrative Remedies**

Although the Court generally cannot "modify a term of imprisonment once it has been imposed", the defendant may bring a motion to modify his or her sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020) ("Congress, aware of the BOP's history of extensive delays, also provided a '30-day lapse' alternative, under which a defendant may proceed directly to district court if his [or her] request is not acted on within that time.").

---

[10] 28 U.S.C. § 994(t) states:

The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. *Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.*

28 U.S.C. § 994(t) (emphasis added).

"Accordingly, a petitioner seeking compassionate release is generally required to exhaust his or her administrative remedies prior to bringing a motion before the district court." *Casey v. United States*, No. 4:18-CR-4 (RAJ), 2020 WL 2297184, at *1 (E.D. Va. May 6, 2020); *see also United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (same).

In response to Mr. Hunt's Motion for Compassionate Release, the United States correctly concedes that Hunt has "properly exhausted his request for compassionate release pursuant to U.S.C. § 3582(c)(1)(A)." (ECF No. 53, at 2.)  This Court so finds.

### C.     Courts Must Find Extraordinary and Compelling Reasons Justifying Compassionate Release

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if "extraordinary and compelling reasons warrant such a reduction[.]"  18 U.S.C. § 3582(c)(1)(A)(i).  Congress did not define "extraordinary and compelling reasons" in the statute. The United States Sentencing Commission does, however, further define "extraordinary and compelling reasons."  U.S.S.G. § 1B1.13(b); *see United States v. Burrell*, No. 3:04-CR-364 (JAG), 2023 WL 7726404, at *4 n.7 (E.D. Va. Nov. 15, 2023).  The Sentencing Commission

> addressed the issue in a policy statement, United States Sentencing Guideline § 1B1.13, which provided the BOP with several categories of extraordinary and compelling reasons to consider.  For years following the passage of the First Step Act, the Sentencing Commission failed to update § 1B1.13 to account for motions filed by defendants, meaning the policy did not bind the courts when presented with a defendant's motion for compassionate release.  A court therefore remained empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.

*Burrell*, 2023 WL 7726404, at *4, n. 7 (cleaned up for readability) (citing *McCoy*, 981 F.3d at 276, 281–82, 284).

11

The 2021 Sentencing Guidelines enumerated four bases on which to evaluate a motion for compassionate release. U.S.S.G. § 1B1.13 cmt. n.1(A)–(D) (U.S. SENT'G COMM'N 2021) identified four bases to establish extraordinary and compelling reasons for release:

> (A) medical conditions;
> (B) age;
> (C) family circumstances; and,
> (D) other reasons.

U.S.S.G. § 1B1.13 cmt., n.1(A)–(D).

In 2023, the United States Sentencing Commission published new sentencing guidelines amendments (the "2023 Sentencing Guidelines Amendments" or "2023 Amendments"). Pursuant to the 2023 Amendments, the Sentencing Guidelines now identify six instructive categories of extraordinary and compelling reasons that may allow for a sentence reduction.[11]

These are:

> (1) certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, [U.S.S.G.] § 1B1.13(b)(1)[12];
>
> (2) the defendant's age, id. § 1B1.13(b)(2)[13];
>
> (3) the defendant's family circumstances, id. § 1B1.13(b)(3)[14];
>
> (4) the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, id. § 1B1.13(b)(4)[15];

---

[11] See Appendix A, U.S.S.G § 1B1.13(b) (2023).

[12] See App. A, at **U.S.S.G. § 1B1.13(b)(1)**; cf. Appendix B, **U.S.S.G. § 1B1.13 cmt. n.1(A).**

[13] See App. A, at **U.S.S.G § 1B1.13(b)(2)**; cf. App. B, at **U.S.S.G. § 1B1.13 cmt. n.1(B).**

[14] See App. A, at **U.S.S.G. § 1B1.13(b)(3)**; cf. App. B, at **U.S.S.G. § 1B1.13 cmt. n.1(C).**

[15] See App. A, at **U.S.S.G. § 1B1.13(b)(4).**

(5)'any other circumstances or combination of circumstances . . . similar in gravity to' the circumstances 'described in paragraphs (1) through (4).' *Id.* § 1B1.13(b)(5) [16], and,

(6) the defendant received an 'unusually long sentence,' *id.* § 1B1.13(b)(6).[17].

*United States v. Tucker*, 2023 WL 8357340, at *5 (D. Md. Dec. 1, 2023).

The United States Court of Appeals for the Fourth Circuit explained—even before the 2023 Sentencing Guidelines Amendments—that "[w]hen a defendant exercises his [or her] new right to move for compassionate release on his [or her] own behalf . . . § 1B1.13 does not apply, and . . . § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 981 F.3d at 281.  The Fourth Circuit further illuminated that:

> [w]hen Congress authorized district courts, as a matter of discretion, to release an inmate from prison based on extraordinary and compelling reasons, it did so to introduce compassion as a factor in assessing ongoing terms of imprisonment, authorizing a district court to give greater weight to an inmate's personal circumstances—when sufficiently extraordinary and compelling—than to society's interests in the defendant's continued incarceration and the finality of judgments.

*United States v. Hargrove*, 30 F.4th 189, 197 (4th Cir. 2022).

Since *McCoy* and *Hargrove*, the 2023 Amendments have taken effect.  These Amendments clarify the Commission's view on what could constitute "extraordinary and compelling reasons" for a sentence reduction under the First Step Act.[18]  The *McCoy* court has

---

[16] *See* App. A, at **U.S.S.G. § 1B1.13(b)(5)**; *cf.* App. B., at **U.S.S.G. § 1B1.13 cmt. n.1(D).**

[17] *See* App. A, at **U.S.S.G. § 1B1.13(b)(6).**

[18] As other courts have observed,

[t]he Fourth Circuit has yet to address the impact the amended Sentencing Guidelines have on *McCoy* and similar rulings or precisely how courts should

noted, however, that the Guidelines, while helpful, are merely advisory and do not bind the Court. "[D]istrict courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)).

The United States Supreme Court has determined that "the First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence[.]" *Concepcion v. United States*, 597 U.S. 481, 500 (2022). District courts within the Fourth Circuit have decided that sentencing disparities resulting from intervening changes in the Fourth Circuit's interpretation of the sentencing guidelines can constitute an "extraordinary and compelling reason" for compassionate release.[19] *See, e.g., United States v. Redd*, 444 F. Supp. 3d 717, 723–724 (E.D. Va. 2020) (finding that the "gross disparity between the sentence Mr. Redd received and the sentence he would have received after the First Step Act . . . constitute[s] [an] extraordinary and compelling reason[] that warrant[s] a reduction to Mr. Redd's sentence"); *United States v. Fennell*, 570 F. Supp. 3d 357, 363 (W.D. Va. 2021) (finding that "the significant

---

apply the amended policy statement in motions for compassionate release, particularly motions filed before November 1, 2023. The Court need not reach this question, however, because [Mr. Hunt] has failed to establish an extraordinary and compelling reason to reduce his sentence applying both the case law before November 1, 2023, and the amended Sentencing Guidelines.

*Burrell*, 2023 WL 7726404, at *4 n.7.

[19] The 2023 Sentencing Guideline Amendments added subsection (c) to U.S.S.G. § 1B1.13, which provides that a change in the law, or in non-retroactive Guidelines amendments, ordinarily shall not be considered when determining whether extraordinary and compelling reasons exist. However, subsection (c) includes an important caveat: "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." U.S.S.G. § 1B1.13(c) (2023).

disparity between Fennell's current sentence and the [ten years reduced] sentence he would face today for the same offense provides an extraordinary and compelling basis for a sentence reduction under § 3582(c)(1)(A)"); *United States v. Arey*, 461 F. Supp. 3d 343, 350 (W.D. Va. 2020) ("The fact that if [the defendant] were sentenced today for the same conduct he would likely receive a [forty year] lower sentence than the one he is currently serving constitutes an 'extraordinary and compelling' reason justifying potential sentence reduction under § 3582(c)(1)(A)"); *United States v. Banks*, 2022 WL 220638, at *2–3, *6 (W.D. Va. Jan. 25, 2022) (88-month difference between the low end of defendant's career offender sentencing range and the low end of the non-career offender sentencing range was "such [a] gross disparit[y] in sentencing" that it constituted an extraordinary and compelling circumstance); *United States v. Williams*, No. 1:14-CR-428 (TSE), 2021 WL 5827327, at *6–7 (E.D. Va. Dec. 8, 2021) (difference of "more than three years longer than the high end of the guidelines that would have applied under *Norman*"[20] warranted a reduction in defendant's sentence from 168 months to 125 months); *United States v. Huggins*, 2021 WL 3025459, at *4 (W.D. Va. July 16, 2021) (sentencing disparity of more than five years was a "gross disparity" and an "extraordinary and compelling" reason warranting a sentence reduction); *but see United States v. Hinton*, No. 2:15-CR-80 (MSD), 2022 WL 988372, at *5 (E.D. Va. Mar. 31, 2022) (three to six year sentencing disparity "not so drastic that it constitutes an extraordinary and compelling reason for relief").

---

[20] *United States v. Norman*, 935 F.3d. 232 (4th Cir. 2019) (finding that defendant was subject to a lower guideline range because a drug conspiracy conviction did not constitute a "controlled substance offense" because the statute of conviction "criminalize[d] a broader range of conduct than that covered by generic conspiracy").

1.    **Medical Circumstances of the Defendant**

The 2023 Sentencing Guidelines Amendments explain in greater detail what a court should consider when considering medical circumstances as a basis for an extraordinary and compelling reason to grant compassionate release.

The relevant section of U.S.S.G. § 1B1.13(b) reads:

(1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT.—

    \*    \*    \*

(D) The defendant presents the following circumstances—

(i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1)(D).

As a result of the coronavirus outbreak, "courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his [or her] prison facility." *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020) (collecting cases). However, "the mere existence of COVID-19 in society . . . cannot independently justify compassionate release." *Id.* (quoting *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (internal quotation marks omitted)).

2.    **Victim of Abuse**[21]

In addition to medical circumstances of the defendant, the 2023 Sentencing Guidelines

Amendments provide that extraordinary and compelling reasons could justify a reduced sentence

if "[t]he defendant, while in custody serving the term of imprisonment sought to be reduced, was

a victim of . . . physical abuse resulting in 'serious bodily injury,' as defined in the Commentary

to § 1B1.1 (Application Instructions)[] that was committed by, or at the direction of, a

correctional officer, an employee or contractor of the [BOP], or any other individual who had

custody or control over the defendant." U.S.S.G. § 1B1.13(b)(4).  The United States Sentencing

Commission Guidelines Manual defines "serious bodily injury" in part as "injury involving

extreme physical pain or the protracted impairment of a function of a bodily member, organ, or

mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical

rehabilitation." U.S.S.G. § 1B1.1, cmt. n.1(M) (2023).

D.    **Courts Must Weigh the Statutory Sentencing Factors Before Granting Compassionate Release**

Even after finding a sufficient "extraordinary and compelling reason" for compassionate

release, the Court must then consider the Section 3553(a) factors and any relevant post-

conviction conduct before modifying a defendant's sentence.  18 U.S.C. § 3582(c)(1)(A);

---

[21] In his Motion, Mr. Hunt does not assert that he is a victim of abuse as a basis for seeking compassionate release, but his claim speaks directly to that new section of the 2023 Guidelines.  Prior to the 2023 Sentencing Guidelines Amendments, "victim of abuse" was not an enumerated category of potential "extraordinary and compelling reasons."  *See infra.*

Because this Court has discretion to consider *any* potential extraordinary and compelling reason, *see McCoy*, 981 F.3d at 284, and because Mr. Hunt presents a claim of abuse in substance if not in name when asserting an assault at Petersburg Medium FCI, the Court must address his claim as such. (ECF No. 47, at 4–5.)  This is especially true given Mr. Hunt's identification of his relegation to the SHU even after his transfer to FCI Butner II as a consequence of the alleged assault. (ECF No. 47, at 5.)  Mr. Hunt flatly asserts that he "is not safe in BOP custody". (ECF No. 47, at 4.)

*Martin*, 916 F.3d at 397–98; *McDonald*, 986 F.3d at 412.  The Court must weigh factors including "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  The Court also must consider "the need for the sentence imposed . . . to promote respect for the law . . . ; to afford adequate deterrence to criminal conduct; . . . [and] to protect from the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2).  The statutory sentencing factors direct the Court to consider the kinds of sentences available and the sentencing range established for the offense.  18 U.S.C. § 3553(a)(4).

### III.  Analysis

After due consideration, the Court will deny the Motion for Compassionate Release. (ECF No. 47.)  Although Mr. Hunt submits, (ECF No. 47, at 4), and the United States concedes, (ECF No. 53, at 2), that he has exhausted his administrative remedies, the Court will deny the Motion for Compassionate Release upon finding that Hunt does not offer any "extraordinary and compelling reasons" to support his request for release.  18 U.S.C. § 3582(c)(1)(A)(i). Additionally, even were Mr. Hunt to offer an "extraordinary and compelling reason" to support his request for release, which he does not, the Court would find that the applicable statutory sentencing factors under § 3553 do not support a reduction of his sentence.

### A.    COVID-19 Does Not Establish an Extraordinary and Compelling Reason for Hunt's Release

Mr. Hunt's Motion for Compassionate Release contends that the Court should grant his immediate release because, medically, his hypertension and "obesity" make him particularly susceptible to complications from COVID-19.  (ECF No. 47, at 5–10.)  But the record does not show that Mr. Hunt faces a particular susceptibility to COVID-19 complications.

In support of his contention that he is at heightened risk from COVID-19, Mr. Hunt points to his hypertension and what he repeatedly calls his obesity.  (ECF No. 47, at 6.)

However, Mr. Hunt fails to provide any persuasive particularized details regarding the severity of his conditions. First, as identified above, Mr. Hunt is not obese; he is 0.1 percentage points in BMI above the CDC standard for being considered "Overweight." *See supra*, at Part I.C.1. If his BMI were just 0.1 percentage point lower, the CDC would categorize him as at a "Healthy Weight." *See id.*

Second, Mr. Hunt's Motion indicates that the blood pressure reading of 145/87, taken on January 13, 2023, places him in the category of Stage 2 hypertension with a systolic blood pressure above 140 mmHg. (ECF No. 47, at 7.) However, his most recent reading before that—127/86, taken on September 12, 2022—would not place him in the Stage 2 hypertension category. (*See* ECF No. 47, at 7; *Facts About Hypertension*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/bloodpressure/facts.htm (last visited Feb. 7, 2024) (reporting that systolic blood pressure of 120–129 mmHg, while elevated, is not hypertension, and that diastolic blood pressure of 80–89 mmHg is classified as Stage 1 hypertension).) Mr. Hunt also takes medication to regulate his blood pressure and his height and weight just barely place him in the overweight category according to the CDC Adult BMI Calculator. (ECF No. 47, at 7.)

Third, Mr. Hunt also adds that his blood pressure likely remains high due to the stress of remaining in the SHU,[22] (ECF No. 47, at 7), but no indication on this record exists that he has been held in the SHU at FCI Hazelton. Also, nothing in his diagnosed GERD increases his risk of contracting COVID-19.

---

[22] Mr. Hunt acknowledges that with adequate recreation time available while not held in the SHU, he could manage his weight with regular exercise. (ECF No. 47, at 7–8.) The United States' Response indicates that Hunt left the SHU on December 8, 2022. (ECF No. 53, at 10.) Neither party has updated the record beyond that.

Separately, hypertension and obesity were highlighted as risk factors early in the pandemic, but "highly effective . . . vaccines dramatically affect whether an inmate's medical conditions constitute the 'extraordinary and compelling reason' required to further consider compassionate release." *United States v. Sanders*, No. SAG-06-087, 2021 WL 1428546, at *3 (D. Md. Apr. 15, 2021) (collecting cases). As of March 3, 2023, Mr. Hunt had received three doses of the COVID-19 vaccine. (ECF No. 47, at 8.)

Finally, as of February 7, 2024, FCI Hazelton has zero active COVID-19 cases among inmates and staff. *See BOP COVID-19 Statistics*, BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData (last visited Feb. 7, 2024). Clearly, FCI Hazelton is not a "correctional facility affected or at imminent risk of being affected" by an ongoing outbreak of infectious disease. *See* U.S.S.G. § 1B1.13(b)(1)(D)(i).

The Court recognizes the grave health risks prisoners have faced during this pandemic and commends nationwide efforts to promptly vaccinate prison staff and inmates. Fortunately, Mr. Hunt has received three doses of COVID-19 vaccination and receives treatment for his hypertension. (ECF No. 47, at 7–8.) But the April 10, 2023 resolution terminating the National Emergency, based on identified reduced COVID-19 trends, suggests that COVID 19—even while reappearing in variant form—no longer requires the drastic actions necessary during its peak.[23] The Department of Health and Human Services confirmed as much when it allowed the federal Public Health Emergency for COVID-19 to expire on May 11, 2023.[24] Considering the

---

[23] *See* H.R.J. Res. 7, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/house-joint-resolution/7 (last visited Feb. 7, 2024).

[24] *See COVID-19 Public Health Emergency*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html#:~:text=Based%20on%20current%20COVID%2D19,day%20on%20May%2011%2C%202023 (last visited Feb. 7, 2024).

foregoing, the Court concludes that no medical condition on this record amounts to an

extraordinary and compelling reason for Mr. Hunt's immediate release from federal

imprisonment due to risks from COVID-19.

**B.      The Safety Conditions of Hunt's Imprisonment Do Not Amount to an**
         **<u>Extraordinary and Compelling Reason for Hunt's Release</u>**

Mr. Hunt's Motion for Compassionate Release further contends that the Court should

grant his immediate release because he is unsafe while in BOP custody. (ECF No. 47, at 4–5.)

However, the record does not show that Mr. Hunt faces a particular risk to his well-being while

remaining in custody at FCI Hazelton.

In support of his contention that he is unsafe in BOP custody, Mr. Hunt points to the

reported assault and the two months spent in the SHU at FCI Butner II. (ECF No. 47, at 4–5.)

Mr. Hunt claims that the alleged assault has sent the message that it is unsafe to seek medical

care. (ECF No. 47, at 5.)  However, Mr. Hunt receives medical treatment in the form of blood

pressure medication, (ECF No.  47, at 7), and in August of 2021, he underwent surgery while in

BOP custody to remove infected hardware that had been inserted as part of treatment for his

prior ankle injury, (ECF No. 51, at 2)—both without incident.

Allegations of abuse are not taken lightly.  However, as far as the Court is aware, the

alleged assault received the benefit of an investigation. (ECF Nos. 47, at 5; 54, at 1.)  Further, no

evidence exists showing that Mr. Hunt's injuries caused "extreme physical pain or the protracted

impairment of a function of a bodily member, organ, or mental faculty," nor does the record

indicate that they "require[d] medical intervention such as surgery, hospitalization, or physical

rehabilitation," *see* U.S.S.G. § 1B1.1, cmt. n.1(M), and therefore do not reach the level of serious

bodily injury contemplated as a basis for release by the 2023 Amendments. *See* U.S.S.G.

§ 1B1.13(b)(4).

Since Mr. Hunt filed his Motion for Compassionate Release, he has been transferred to

FCI Hazelton, where nothing on this record indicates that he has spent any time in the SHU,

meaning that he no longer faces the risks that prolonged SHU confinement might pose. *See Fed.*

*Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 7,

2024). For that reason, the claims of assault and confinement in the SHU presented by Mr. Hunt

do not rise a finding of extraordinary and compelling circumstances warranting immediate

release from confinement. Even considering his medical condition together with those claims,

Mr. Hunt's allegations do not rise to the level warranting immediate release.

    **C.**    **The 3553(a) Factors Do Not Support a Reduction in Mr. Hunt's Sentence**

Although the Court has found that no extraordinary and compelling reasons exist to

warrant Mr. Hunt's release, the Court will nonetheless consider his request under the applicable

statutory sentencing factors articulated in 18 U.S.C. § 3553(a).

Upon review, Mr. Hunt's criminal history demonstrates a high risk of recidivism and

presents a threat to the public through his disregard for the law. Even at Criminal History

Category V, Mr. Hunt has an extensive criminal history, including contempt of court, failure to

appear, identity theft to avoid arrest, falsely identifying himself to law enforcement, forgery of

public records, possession of a firearm by a convicted felon, driving while intoxicated, and not

reporting to jail. (ECF No. 27 ¶¶ 47–69.) Mr. Hunt also committed the underlying offenses

while under a criminal justice sentence for driving while intoxicated and possession of

marijuana. (ECF No. 27 ¶ 71.)

Further, Mr. Hunt does not propose conditions of release that would protect the safety of

the community. Mr. Hunt's release plan is to live in his parents' home with his two sons. (ECF

No. 47, at 12.) He states that he "is ready to [go] home and be a father and an example" to his

children. (ECF No. 47, at 13.)  Mr. Hunt also claims that "[a] large portion of [his] criminal history is the result of alcohol and substance abuse." (ECF No. 47, at 12.)

This does not convince the Court that Mr. Hunt will not pose a danger to the public or that the safety of the community will be protected.[25]  Mr. Hunt was living with his wife and children when he committed many of the offenses in his criminal history.  (ECF No. ¶ 97.)  Most importantly, this Court granted Mr. Hunt's original downward variance request in part due to his claims that "[n]early half [of] Mr. Hunt's criminal history stems from alcohol and substance abuse." (ECF No. 23, at 1.)  It falls at the low end even of his guidelines with the 821 Amendment adjustment.  (*See* ECF No. 56, at 1.)

In *United States v. Martin*, the Fourth Circuit vacated and remanded the district court's denial of both defendants' motions to reduce sentence because the district court failed to address any new mitigating evidence when denying the motions.  916 F.3d at 397–98.  The Fourth Circuit explained that if an individual is eligible for a sentence reduction, the district court must give weight to the person's "past transgressions" as well as "the multitude of redemptive measures that [the person] has taken." *Id.* at 397.  However, Congress has made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).  With these dictates in mind, the Court acknowledges and commends Hunt's participation in BOP programs and encourages him to continue to do so but

---

[25] During Mr. Hunt's sentencing, the Court recommended that Mr. Hunt participate in a 500-hour intensive drug treatment program, educational and vocational training, and an anger management program.  (ECF No. 47, at 11 (citing ECF No. 36, at 2).)  Even though Mr. Hunt was unable to complete the Court's recommend rehabilitation during COVID-19 restrictions or when he was in the SHU, he has now "completed Drug Education classes between June 27, 2022, and July 12, 2022", (ECF No. 51, at 2), and had begun to participate in residential drug treatment on March 13, 2023, (ECF No. 53-1, at 1).  The record does not show that Mr. Hunt had yet participated in any educational and vocational training or anger management program.  (*See* ECF No. 53-1.)

finds that these measures do not warrant his immediate release in light of the nature and circumstances of his underlying conviction, the history he brings to this Court, the totality of his record, and the need to protect the public.

This is especially true because, at the time of filing, Mr. Hunt had accrued four disciplinary reports during the first three years and six months of his incarceration. (ECF No. 53-2, at 1–2.) Mr. Hunt had been sanctioned for refusing work, refusing to obey an order, being insolent, possessing a hazardous tool, mail abuse, and disrupting monitoring. (ECF No. 53-2, at 1–2.) The most recent of these infractions was in June of 2022. (ECF No. 53-2, at 1.) Thus, in addition to considering "the multitude of redemptive measures that [Hunt] has taken", *see Martin*, 916 F.3d at 397, the Court adds that other of Hunt's actions since incarcerated cut against a finding of redemption and rehabilitation.

In total, consideration of the 18 U.S.C. § 3553(a) factors does not support compassionate release even if this Court were to find an "extraordinary and compelling reason[]" to warrant a reduction in Hunt's sentence. *See* 18 U.S.C. § 3582(c)(1)(A).

### IV.  Conclusion

For the reasons explained above, the Court will deny the Motion for Compassionate Release. (ECF No. 47.) Mr. Hunt's *Pro Se* Motion for Compassionate Release, (ECF No. 38), is denied as moot.

An appropriate Order shall issue.

Date: 2/7/2024
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

24